# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Jan 30, 2026
s/ vge
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
(414) 324-5384 (the "Target Cell Phone"),as further described in Attachment A

Case No. 26-856M(NJ)

Matter No. 2024R438

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ______________ District of ______________________ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. 841, 846, 856; and 843(b); 18 U.S.C. 924(c) | Distribution/possession with intent to distribute controlled substances and conspiracy to do the same; maintain drug involved premises and conspiracy to do the same; use of a communication facility in furtherance of a drug trafficking offense; and possession of a firearm in furtherance of a drug trafficking offense |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 04/29/2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Curt R Hansen
*Applicant's signature*

Curt Hansen, SA HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 1/30/2026 @ 10:28 a.m.

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

<u>**ATTACHMENT A**</u>
**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. Records and information associated with the cellular device assigned call number **(414)324-5384** (the **"Target Cell Phone"**), whose service provider is Dish Wireless LLC, a wireless telephone service provider headquartered at 9601 Meridian Blvd, Englewood, CO 80112, with services also attached to AT&T, headquartered at 11760 U.S Highway 1, Suite 300, North Palm Beach, Florida, 33408; T-Mobile, headquartered 4 Sylvan Way, Parsippany, NJ 07054; or any other cell phone servicing company currently servicing these phone numbers ("Service Providers") during the requested period.

2. The **Target Cell Phone**.

## ATTACHMENT B
## Particular Things to be Seized
## MATTER NUMBER 2024R438

### I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Providers, including any information that has been deleted but is still available to the Service Providers or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Providers is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with **Target Cell Phone** for the time period from January 20, 2026, to present:

    i. Names (including subscriber names, user names, and screen names);

    ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii. Local and long distance telephone connection records;

    iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v. Length of service (including start date) and types of service utilized;

    vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Target Cell Phone**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from **Target Cell Phone** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone** or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today's date, for such information associated with **Target Cell Phone**.

c. Information about the location of **Target Cell Phone** for a period of **30 days**, during all times of day and night. "Information about the location of **Target Cell Phone** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the

Service Provider's services, including by initiating a signal to determine the location of **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense; and possession of a firearm in furtherance of drug trafficking, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856; and Title 18, United States Code, Section, 924(c), have been committed by Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, Amer S. QADAN, "VENEZUELA," "FROG," and other persons as yet unknown since at least August 2024.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Jan 30, 2026
s/ vge
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
(414) 324-5384 (the "Target Cell Phone"), as further described in Attachment A

Case No. 26-856M(NJ)
Matter No. 2024R438

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______________ District of ______________________
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 2/13/2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for _____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 04/29/2026.

Date and time issued: 1/30/2026 @ 10:28 a.m.

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: 26-856M (NJ) | Date and time warrant executed: 01/30/2026 11:53 AM | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of : SA Luke Hepp

Inventory of the property taken and name(s) of any person(s) seized:

Cellular data, tower data, Internet protocol data, E911 data.

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 08/20/2026

Curt R Hansen

*Executing officer's signature*

Curt Hansen / Special Agent

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT MATTER NUMBER 2024R438**

I, United States Department of Homeland Security Investigations (HSI) Special Agent Curt Hansen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application of a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call number **(414) 324-5384** (the **"Target Cell Phone"**), whose service provider is Dish Wireless LLC ("Service Provider") a wireless telephone service provider headquartered at 9601 Meridian Blvd, Englewood, CO 80112, with services also attached to AT&T, headquartered at 11760 U.S Highway 1, Suite 300, North Palm Beach, Florida, 33408 or any other cell phone servicing company currently servicing **Target Cell Phone** number during the requested period. **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3. Because this warrant application seeks the prospective collection of information,

including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phone**.

4. I am a Special Agent of HSI, assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I have been employed with HSI as a Special Agent for approximately five years. Prior to employment with HSI, I worked as a Deputy United States Marshal, Federal Air Marshal, and United States Border Patrol Agent.

5. I have been a sworn federal law enforcement officer specifically investigating crimes involving controlled substances, firearms, smuggling, terrorism, and immigration since September 2011. Throughout my law enforcement career, I have received training in general law enforcement and in specialized areas including distribution of controlled substances and human smuggling. I am an investigator or law enforcement officer of the United States within the meaning of Title 8, United States Code, Section 1357(a)(5), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrests for, certain offenses enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code, and other related offenses.

6. Since becoming employed as a federal agent, I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia. I have personally conducted and participated in numerous controlled substances,

firearms, gang, and human trafficking investigations and I am familiar with the various methods that criminals use when engaging in these offenses.

7. As part of my duties, I investigate criminal violations relating to controlled substance trafficking, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, and 846. I also investigate criminal violations relating to unlawfully possessed firearms, firearms trafficking, and possession of machineguns, including criminal violations of Federal firearms laws, including, but not limited to Title 18, United States Code, Sections 922, 933, and 924.

8. I have received training related to the investigations and enforcement of federal human trafficking laws including, but not limited to Title 18, United States Code, Sections 1591, 1594, and 2421. As a result of this training and my experience, I am familiar with the methods traffickers use to recruit, communicate with, and exploit their victims, like by controlled substances and the use of technology. These include posting online advertisements for commercial sex dates, communicating electronically with prospective commercial sex buyers, and distributing sexually explicit images and videos of trafficking victims.

9. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and the seizure, processing, and identification of electronic devices.

10. By virtue of my employment as a federal agent and prior experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a. I have functioned as both a case agent and co-case agent in numerous investigations into drug trafficking conspiracies, firearm offenses, and human trafficking.
b. I have interviewed witnesses, confidential human sources (CS) and sources of

information (SOI) regarding drug trafficking and the distribution of monies and assets derived from drug trafficking(laundering of monetary instruments);

c. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States.

d. I have also relied upon informants to obtain controlled substances from dealers.

e. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

f. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, fentanyl, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of various controlled substances.

g. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

h. I know that drug traffickers often use electronic equipment and cellular telephones to conduct drug trafficking operations.

i. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

j. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking.

k. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement.

l. I am familiar with the language utilized over the telephone to discuss illegal firearms and machinegun conversion devices and know that the language is often limited, guarded, and coded.

m. I have utilized informants to investigate the sale and possession of illegal firearms, and I have also relied upon informants to obtain illegal firearms from dealers.

n. I know that people engaged in the illegal possession or distribution of firearms often use electronic equipment and cellular telephones to conduct firearm trafficking operations.

o. I have interviewed or participated in interviews of witnesses, confidential human sources (CS), and sources of information (SOI) relative to the illegal possession and distribution of firearms.

p. I have engaged in, assisted in and planned undercover operations: to include

purchasing illegal substances and arrangement of sex for money transactions.

q. I have engaged in investigations of places of prostitution and drug use and know that drug traffickers will at time trade sexual favors for the payment of drug debts.

11. Further, based on training and experience, I am aware that it is a common practice within a drug trafficking organization (referred hereinafter as a ("DTO") to have various tasks assigned to persons involved in the organization. The members of the organization may have certain tasks, dependent on their hierarchy within the organization. It is common for those in charge of the organization to use those below them to make deliveries, transport, and hold/take possession of items, such as controlled substances for distribution or firearms for protection/intimidation. The persons higher in the DTO often avoid conducting the hand-to-hand transaction in order to insulate themselves, to avoid apprehension/detection from law enforcement.

12. I have participated in investigations that have led to the issuance of search warrants involving drug trafficking, firearms offenses, and human trafficking. These warrants involved the search of locations including residences and businesses of targets, their associates and relatives; "stash houses" (i.e., houses used as drug/money storage locations); storage facilities; cellular/camera phones; and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from the distribution and sale of controlled substances, firearms, and/or human trafficking, and monetary instruments and various assets that were purchased with the proceeds of the drug trafficking, firearms, and/or human trafficking.

13. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that

often drug houses, also called trap houses, are established as places where a variety of drug-motivated crime can occur at a single location. This includes serving as a place where (1) drugs are stored, processed/packaged, sold, and/or used; (2) commercial sex acts are performed in exchange for drugs or money to purchase drugs; (3) stolen goods are sold/traded for drugs or money to purchase drugs; and (4) drug proceeds are stored before they are able to be laundered by the organization. Further, trap houses, also serve the purpose of concealing this illegal conduct from the view of law enforcement. For example, open-air drug markets where drugs are bought and sold on a street corner allow law enforcement to observe hand-to-hand transactions and more easily identify illegal conduct. By contrast, trap houses allow the trafficker to conduct drug sales behind closed doors and to control who is allowed access to the residence. These types of trap houses are commonly run by persons who are trusted to hold drugs and money and who are usually armed or given armed protection to perform this task. Oftentimes, these trap house operators as well as multiple drug users and others will be within the trap house so as to make it difficult to attribute possession of any drugs found within the trap house during a search conducted by law enforcement.

14. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that drug traffickers may also establish stash houses. I am aware that stash houses are established as places where drug traffickers store large quantities of controlled substances, firearms, and cash. Drug traffickers may establish a trap house and a separate location as a stash house, where drug traffickers do not engage in sales to drug customers at the location, but use the location primarily for storage. Similar to trap houses, stash houses also serve the purpose of concealing this illegal

conduct from the view of law enforcement and make it difficult to attribute possession of any drugs, firearms, or cash found within the stash house to a particular individual during a search conducted by law enforcement. For example, stash houses allow the trafficker to store a large amount of controlled substances at a location separate from their residence. Stash houses are often not in the drug trafficker's name, have minimal furniture, minimal signs of typical residential activity, lack items inside connecting the location to the drug trafficker, and are generally a quiet location with limited activity, which avoids drawing complaints or concerns from neighbors or law enforcement.

15. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including to prove intent, motive, and to identify co-conspirators.

16. I have conducted investigations ranging from death, drug, property, and human trafficking crimes by analyzing cell phone data including tower usage, call activity, and cellular activity while trying to pinpoint certain locations of suspects and/or victims. I know that when conducting drug and/or human trafficking investigations, cellular phone data is often a key piece of evidence based on my training and experience. Individuals who sell and use controlled

substances and who engage in the trafficking of others often use cell phones to set up a transaction either through traditional means (phone calls or messaging) or by use of special applications downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos. The same is true for those individuals who engage in drug trafficking and human trafficking.

17. I am familiar with the technologies of drug traffickers and those engaged in human trafficking. I know that drug traffickers and/or human traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking and/or human trafficking operations. I know drug traffickers and/or human traffickers often use electronic devices, such as cellular devices, to generate, transfer, count, record, or store the information described above and to conduct drug trafficking and engage in human trafficking. I am familiar with computers, cellular devices, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and with fellow traffickers and/or human trafficking victims, customers, co-conspirators, and fellow human traffickers. I know that drug traffickers and/or human traffickers often keep documents and records about drug transportation, drug sourcing, drug ordering, drug sale, drug distribution, victim information, victim posting, posting of advertising, communication with sex trafficking customers, human trafficking proceeds, etc. These documents, records, receipts, notes, and

ledgers, regarding drug trafficking and/or human trafficking are often maintained where the traffickers have ready access. These records may be stored within computers, cellular devices, and other electronic media or electronic storage devices. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers and/or human traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, their drug proceeds, their trafficking victims, and/or customers. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

18. I am currently participating in an investigation of the TARGET DTO and its members and associates. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) recorded jail calls which, prior to the parties' discussion, provided a warning that the calls would be recorded; (c) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (d) information obtained from witnesses, including confidential sources; (e) administratively subpoenaed and court ordered records; and (f) court authorized wire and electronic intercepts of telephone numbers **(414) 439-8361 (TARGET TELEPHONE 1)** and **414-639-1158 (TARGET TELEPHONE 2)**, used by LOPEZ and [redacted]

[redacted][1], DOB: [redacted]/2009 (herein referred to J.M.L.).

19. Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

20. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of:

**a.** possession with intent to distribute and the distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1);
**b.** maintaining a drug-involved premises in violation of Title 21, United States Code, Sections 856(a)(1) and 856(a)(2);
**c.** conspiracy to commit those offenses in violation of Title 21, United States Code, Section 846;
**d.** use of communication facilities to further and to facilitate the above listed offenses, in violation of Title 21, United States Code, Section 843(b); and
**e.** use of a firearm in furtherance of drug trafficking, in violation of Title 18, United States Code, Section 924(c)

(hereinafter referred to collectively as the "TARGET OFFENSES")[2].

---

[1] Given J.M.L.'s minor status, case agents have placed J.M.L.'s full name in this sole location and will refer to the target subject only by J.M.L. throughout the affidavit to limit future redactions.

[2] At this time, the wire pleadings provide probable cause that **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** are being used to commit all the TARGET OFFENSES enumerated in this paragraph, including Title 18, United States Code, Sections 924(c). To date, and to my knowledge, **TARGET TELEPHONE 3** has **not** been used to commit firearm-related offenses. Going forward, the United States will update the Court if **TARGET TELEPHONE 3** is used to discuss, and/or if TARGET SUBJECTS other than LOPEZ and J.M.L., are involved in, acts constituting violations of 18 U.S.C. Sections 924(c). Herein, when "TARGET OFFENSES" is used in reference to TARGET SUBJECTS other than LOPEZ and J.M.L. and/or **TARGET TELEPHONE 3,** it means only violations of Title 21, U.S.C., Sections 841(a)(1), 843(b), 856, and 846. When "TARGET OFFENSES" is used in reference to LOPEZ and J.M.L., and/or **TARGET TELEPHONE 1 or TARGET TELEPHONE 2,** it means all the offenses listed in this paragraph.

have been committed by Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, Amer S. QADAN, "VENEZUELA," "FROG," and other persons as yet unknown (hereinafter "TARGET SUBJECTS"). There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

**JURISDICTION**

21. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**<u>Relevant Federal Court Orders</u>**

22. At various times between April 2025, and January 2026, United States Magistrate Judges for the Eastern District of Wisconsin have authorized the use of pen registers and trap and trace devices for DTO telephone lines including **TARGET TELEPHONE 1, TARGET TELEPHONE 2, TARGET TELEPHONE 3,** and telephones associated members of the DTO.

23. At various times between April 2025, and January 2026, United States Magistrate Judges for the Eastern District of Wisconsin have signed orders for prospective precision location data (pings) for DTO telephone lines including **TARGET TELEPHONE 1, TARGET TELEPHONE 2, TARGET TELEPHONE 3,** and telephones associated members of the DTO.

**Interceptions over TARGET TELEPHONE 1 and TARGET TELEPHONE 2, show that TARGET TELEPHONE 1, TARGET TELEPHONE 2, and Target Cell Phone are being used to commit the TARGET OFFENSES**

24. Wire and electronic interceptions over **(414) 439-8361** (**TARGET TELEPHONE 1**) and wire interceptions over **414-639-1158** (**TARGET TELEPHONE 2**) began on December 19, 2025, and extended on January 16, 2026. I believe that LOPEZ is the user of **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** during the below conversations because I have now listened to numerous intercepted calls over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**, and LOPEZ's prior jail calls using **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**. From these calls, I am familiar with LOPEZ's voice. Further, at certain times during the wire intercepts, LOPEZ discusses matters, which are consistent with her personal life. For example, over numerous calls on December 21, 2025, LOPEZ, using **TARGET TELEPHONE 1** discussed needing to obtain a "package" that was scheduled to be delivered to S2 Real Estate. At approximately 1:06 p.m., electronic surveillance revealed LOPEZ arrived at S2 Real Estate, signed for, and received a package that had just been delivered by FedEx. Also, on January 9, 2026 LOPEZ using, **TARGET TELEPHONE 2**, discussed needing to go to 829 W. Greenfield Avenue to confront individuals who had reportedly broken into apartment 5. Soon thereafter, surveillance units observed LOPEZ and J.M.L. at 829 W. Greenfield Avenue. In addition, location data for **TARGET TELEPHONE 2** revealed it was in the immediate vicinity of 829 W. Greenfield Avenue at this time as well.

25. Further, based on the court authorized intercepts, I believe that Otis Lockett is the user of **Target Cell Phone** during the below conversations because I have now listened to

numerous intercepted calls over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**, and LOCKETT'S prior jail calls. From these calls, I am familiar with LOCKETT'S voice. Further, at certain times during the wire intercepts and record jail calls, LOCKETT discusses matters, which are consistent with his personal life.

## PROBABLE CAUSE

***Background***

26. Case agents have been investigating members of the Target DTO since at least May 2024.

27. Special Agents of HSI, case agents and local officers have received information concerning the illegal drug trafficking activities of members of the TARGET DTO from confidential human sources (CS#1 and CS#2):

(a) CS#1 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation. The information has been verified through controlled buys, video recordings obtained during the controlled buys, queries through law enforcement databases, and surveillance. CS#1 began cooperating with law enforcement for consideration on pending criminal drug charges in Forest County beginning in approximately March 2025. CS#1 has had past arrests or convictions for felony drug offenses, felony family support offenses, felony and misdemeanor bodily harm offenses, resisting/obstruction, traffic offenses and noncriminal retail theft offenses. Further, during CS#1's cooperation, on May 30, 2025, CS#1 was re-arrested on drug offenses by State Patrol in Outagamie County, and his cooperation ended. This drug conduct was not at the direction of law enforcement and was contrary to

CS#1's cooperation agreement. Within the context of the information detailed and relied upon for purposes of this application, I believe that CS#1 is credible and that CS#1's information is reliable notwithstanding CS#1's violation of CS#1's cooperation agreement.

(b) CS#2 reported to the case agents with the FBI from approximately March of 2025 to the end of May 2025. In May 2025, CS#2 began cooperating with HSI. CS#2 was initially cooperating with FBI and other law enforcement officers in hopes of receiving third-party consideration for a family member on a felony criminal matter, until May 2025. No consideration has been provided to that family member. CS#2 is now cooperating in exchange for monetary consideration. To date, CS#2 has received one monetary payment of $5,000 for CS#2's cooperation with HSI. Certain information provided by CS#2 concerning this investigation has been corroborated from external sources, including consensually recorded audio and visual recordings, and a review of information contained within law enforcement databases. CS#2 is a convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CS#2 has prior felony convictions for Robbery and Manufacture / Deliver Cocaine. I have discussed CS#2's cooperation with the law enforcement officer with whom CS#2 was working in exchange for third-party consideration. Said officer indicated that CS#2 has provided reliable cooperation to that agency and believes that CS#2 is reliable. At no time during CS#2's cooperation with the HSI have I found CS#2 to have provided false information or engaged in untruthful or

deceptive behavior. As further detailed below, during controlled operations, the basis of CS#2's information has been confirmed by case agents and determined to be truthful and reliable. Further CS#2's information is based on his/her own personal observations and participation in surveilled controlled operations. Within the context of the information detailed and relied upon for purposes of this application, I believe that CS#2 is credible and that CS#2's information is reliable. CS #2 is currently cooperating with law enforcement.

***Court Authorized Intercepts and Investigation into DTO***

28. **Otis LOCKETT III,** (hereinafter "LOCKETT"), DOB: May, 31, 1984, shares children with LOPEZ and is believed to be engaged in drug trafficking with LOPEZ, J.M.L., and other DTO members.

a. LOCKETT was in custody at the Milwaukee County House of Corrections and was released on January 21, 2026.

b. Case agents believe that LOCKETT is in a romantic relationship with LOPEZ and still engaged in drug trafficking while incarcerated, based upon multiple jail calls between LOCKETT and LOPEZ. Case agents have observed that LOCKETT will use his own Prison Inmate Pin (PIN) to contact **TARGET TELEPHONE 1**. However, case agents have also located additional recorded jail calls to **TARGET TELEPHONE 1** made with other inmates' PINs. Based on my training and experience, I know that those engaged in illegal conduct while in custody, including drug trafficking, may use different inmates' PINs in an attempt to evade law enforcement detection. Based on case agents' review of the calls between

LOCKETT's PIN and LOPEZ, case agents recognize LOPEZ's voice and LOCKETT's voice. Case agents similarly recognized LOPEZ and LOCKETT's voices, in recorded jail calls between other inmates' PINs, and LOPEZ using **TARGET TELEPHONE 1**. Further, the content of the calls is consistent with LOCKETT's and LOPEZ's relationship, such as LOCKETT addressing himself as the father of LOPEZ's children.

c. Case agents have listened to recorded jail calls between LOCKETT and LOPEZ using **TARGET TELEPHONE 1** that are consistent with LOCKETT and LOPEZ engaging in drug trafficking, including obtaining suspected controlled substances, directing J.M.L. to deliver controlled substances to other DTO members, and concerns over law enforcement contact. As detailed below, J.M.L. is LOPEZ's juvenile son.

d. Case agents believe LOCKETT is the user of telephone **(414) 324-5384** (the **"Target Cell Phone"**) because: (1) case agents intercepted court authorized intercepts from LOPEZ using TARGET TELEPHONE 1 to **(414) 324-5384 (Target Cell Phone)** and the detail shared between LOPEZ and the user of **(414) 324-5384 (Target Cell Phone)** are consistent with LOCKETT being the user. For example on January 21, 2026, as outlined below, LOCKETT using **(414) 324-5384 (Target Cell Phone)** discusses obtaining his two phones from police custody, one being **(414) 324-5384 (Target Cell Phone)**. Additionally, on January 12, 2025 there was a traffic stop made by the Milwaukee County Sheriff's Office (Activity # 25-001130 - Citation / 25-007072 – Otis LOCKETT

is caller) wherein police contact was made with LOCKETT and the phone number was reported for LOCKETT was **(414) 324-5384 (Target Cell Phone)**.

e. LOCKETT's criminal history consists of the following criminal convictions: Manufacture / Deliver Cocaine (<=5 grams) - Party to a Crime (Date of Conviction: 09-25-2002); Possession of THC (2nd + Offense) (Date of Conviction: 10-20-2004); Possession of Firearm by Felon (Date of Conviction: 05-02-2007); Burglary – Building or Dwelling (Date of Conviction: 11-23-2009); Attempt Theft (Date of Conviction: 02-08-2013); Possession of Firearm by a Felon and Possession of THC (2nd + Offense) (Date of Conviction: 04-30-2018); and Disorderly Conduct, Domestic Abuse and Resisting or Obstructing (Date of Conviction: 07-07-2025) which he is currently serving a sentence. LOCKETT has a criminal history that includes arrests for Probation Violation, Vehicle Operator Flee / Elude an Officer, 2nd Degree Recklessly Endangering Safety, Possession of Cocaine, Disorderly Conduct, Battery or Threat to a Judge, Resisting or Obstructing an Officer, Possession of a Firearm – Convicted Felon, Manufacture Deliver Cocaine, Retail Theft, Possession of Drug Paraphernalia, Possession THC, Trespass to Land or Dwelling, Theft Moveable Property, Endangering Safety Use of a Dangerous Weapon, Carrying a Concealed Weapon, and Possession with Intent – Cocaine.

29. On December 29, 2025, at approximately 9:00 p.m., LOPEZ, using **TARGET TELEPHONE 1**, received a call from LOCKETT at the Milwaukee Secure Detention Facility using IC Solution's general jail number, (414) 533-1440. LOCKETT said, "Man I wonder

Angie and them at, [U/I] in the alley." LOPEZ replied, "Uh, I don't know. I still be seeing them sitting outside though…I said, they still be sitting outside." LOCKETT asked, "Who, Angie and them?" LOPEZ answered, "Not Angie. Uh, I'm talking about Too Tall and them." LOCKETT said, "Okay. I'll figure it out. Man, I hope it won't be too much of a hassle trying to get all my people back, bro… Remember Kelly?" LOPEZ said, "Oh, yeah, the white lady." LOCKETT acknowledged, "Hell yeah. [U/I] like super sweating her ass." Later in the conversation, LOCKETT stated, "I might come work…I might come work for y'all for a little while too." LOPEZ reacted, "For real? Okay." LOCKETT continued, "Like I used to when I got myself, when I start grinding, I was working for you. I was needing action at work. You know what I'm saying? You was putting me in the right spots at the right time. I think I can do that [U/I] getting out of jail, about a week after I get out, work there for a couple of months."

30. Case agents believe Angie and Kelly were previous drug customers of LOCKETT's, and that LOCKETT said he hoped when he get released from incarceration he would be able to resume drug trafficking using some of his previous customers ("I hope it won't be too much of a hassle trying to get all my people back"). Case agents know from training and experience that "action" and "grinding" are terms used by drug traffickers to describe selling controlled substances to customers. Therefore, case agents believe that when LOCKETT gets released from incarceration, he plans to rent places from S2 Real Estate to drug trafficking. ("I might come work for y'all for a little while too" and "Like I used to when I got myself, when I start grinding, I was working for you). Case agents believe LOCKETT indicated that he previously worked for S2 Real Estate, and that S2 Real Estate allowed him to rent residences for

the purpose of selling narcotics ("I was needing action at work. You know what I'm saying? You was putting me in the right spots at the right time").

31. Also on January 9, 2026, case agents intercepted numerous wire communications from LOPEZ, at **TARGET TELEPHONE 1**, regarding the building at 829 South 19th Street, Milwaukee, Wisconsin, being broken into. Case agents have also identified 829 South 19th Street, Milwaukee, Wisconsin as LOCKETT's suspected trap house based on recorded jail calls and court authorized intercepts. Through the numerous communications with LOPEZ using **TARGET TELEPHONE 1,** case agents identified J.M.L., ABRAHAM, BOFFIL, and "Frog" as all being contacted to assist LOPEZ in getting the individuals who broke into 829 South 19th Street out of the building and securing the location. Based on the concerns for safety during these court authorized intercepts, case agents attempted to have local law enforcement intervene; however, the incident was over prior to officers arriving.

32. At approximately 7:07 P.M., LOPEZ, using **TARGET TELEPHONE 1**, called ABRAHAM using (414) 676-7540. During the call, LOPEZ tells ABRAHAM about the people who broke into 829 South 19th Street. LOPEZ expresses that she has been doing everything to keep the place secure. ABRAHAM states he can drive over there and asks if "Frog" is going as well. ABRAHAM expressed that he did not want LOPEZ to go there by herself. ABRAHAM states that he would smack the guys, and they would not come close with some pistols. ABRAHAM tells LOPEZ he believes that the "white guy" let them in and smokes dope. Both parties further discuss who to send to the location.

33. Based on my training and experience the investigation to date, case agents believe that 829 South 19th Street was used by LOCKETT as a trap house. Based on LOCKETT and

LOPEZ's conversations about LOCKETT resuming his drug trafficking activities and his statements about LOPEZ putting him in the right spots, as described above in Paragraph 30, case agents believe that LOPEZ is preparing 829 South 19th Street for LOCKETT's use for drug trafficking activities. Accordingly, case agents believe that LOPEZ's conversation with ABRAHAM, as described above related to keeping 829 South 19th Street secure pending LOCKETT's release. Further, case agents believe that to ensure that this location is available for LOCKETT to use for drug trafficking upon his release, LOPEZ knows that the squatters must be removed.

34. On January 9, 2026, case agents intercepted a call to LOPEZ on **TARGET TELEPHONE 2** from LOCKETT. During the call, J.M.L. gets on the line and LOCKETT and J.M.L. discuss firearms at the residence. LOCKETT says that he is upset about the guy playing with the thing. Based on prior court authorized intercept, I believe LOCKETT was referring to an individual named Jayden ("guy") playing with LOCKETT's firearms in the residence ("play with the thing"). J.M.L. says he understands. LOCKETT says that he doesn't want to have to get released and take that thing. Based on the content of the call, I believe LOCKETT was referring to a firearm ("thing"). J.M.L. says he told him [Jayden] that LOCKETT would take it if it is out or around. J.M.L. states that Jayden said that he doesn't leave the house without his gun. J.M.L. further warned Jayden to not let LOCKETT see him, which based on the context of the statement, I believe was referring to Jayden's firearm. LOCKETT affirms and says that if he hears him [Jayden] playing with it then he will call ask for it. J.M.L. states he [Jayden] is cocking the gun for no reason and taking the slide off every couple of seconds. Based on these statements, I again believe LOCKETT is referring to a firearm. LOCKETT says he [Jayden] is

going to break it and it won't work. Based on the prior statements made during the call, I believe “it” refers to a firearm. LOCKETT says that they don't have a reason to have one and he just wants to make sure nothing happens before he gets home. Based on Lockett’s statement, I believe LOCKETT is referring to J.M.L. and/or Jayden not needing a firearm and that LOCKETT wants to make sure everyone is safe at the residence.

35. During this same call LOCKETT and J.M.L. discuss how J.M.L. needs to get back into contact with someone, because J.M.L. is “ready”. Based on prior court authorized intercept between LOCKETT and J.M.L. on **TARGET TELEPHONE 1** and **TARGET TELPHONE 2**, I believe J.M.L. is stating he is ready to obtain additional controlled substances. J.M.L. asks LOCKETT to contact “him” because J.M.L. does not have his number. Based on my training, experience, and investigation into the DTO, I believe J.M.L. does not have the number for the drug source and is asking LOCKETT to contact the source. LOCKETT says that he has the guy’s email and that they can Facetime. Based on my training and experience, I know that those engaged in criminal conduct will often use Facetime to discuss their criminal conduct, because criminal offenders often believe Facetime communication cannot be intercepted by law enforcement. Therefore, I believe, LOCKETT’s and J.M.L.’s conversation is consistent with discussing contacting a drug source to obtain additional controlled substance to sell. LOCKETT also tells J.M.L. that he will be released on the 19th, which based on other court authorized interceptions, I believe refers to January 19, 2026. I further believe LOCKETT is referencing this date to let J.M.L. know that LOCKETT will take over the drug trafficking business once released.

36. On January 17, 2026, LOPEZ, using **TARGET TELEPHONE 1**, received a call

from LOCKETT at the Milwaukee Secure Detention Facility using IC Solution's general jail number, (414) 533-1440. During the call Lopez stated that she spoke with "Monty" and that he was supposed to come to the house but never did. LOPEZ was also supposed to $600 and LOCKETT replies that this is not bad. LOPEZ told LOCKETT that she will have J.M.L. call Monty when J.M.L. returns home.

37. Based on my training and experience, I believe Monty is a drug dealer due the nature of the conversation in this call. For example the price of $600 is consistent with a price for an ounce of cocaine. LOPEZ and LOCKETT also both refrain from speaking about what it is that they are purchasing for the $600 throughout the call, which is consistent with the manner one would speak on a recorded jail call concerning an illegal substance. In addition there were previous calls between LOPEZ and LOCKETT from days prior that referenced LOPEZ running out and not having the necessary drugs to sell to "B". "B" has been identified as Brandon KING during this investigation and is known to do short hand-to-hand transactions with LOPEZ at the rear entrance of her home. Previous jail calls also speak of "B" as being a past customer of LOCKETT that was still being served by LOPEZ during his absence in jail.

38. On January 21, 2026, case agents intercepted a call to LOPEZ on **TARGET TELEPHONE** from LOCKETT, using **(414) 324-5384 (Target Cell Phone)**. During the call, LOCKETT tells Lopez he received his phones from police custody:

**LOCKETT:** [ASIDE: I'on know. Wassup, you good? You been good? Yeah, I' m good. I' m super (U/I) now. Yeah, I' m finna– I' m on the South Side. I' **ll** call you when I (U/I). A'right, I got you. A' right.] So, um.

**LOPEZ**: Yeah.

**LOCKETT**: Already crackin' , what' s happenin' .

**LOPEZ:** You already went and picked it up?

**LOCKETT:** What? Nah, I ain't get–

[VOICES OVERLAP]

**LOPEZ:** Your phone.

**LOCKETT:** Yeah, I got my phone now. They had it in my property.

**LOPEZ:** Both of ' em?

**LOCKETT:** Yup.

**LOPEZ:** A' right. Don't make no sense.

**LOCKETT:** You said what?

**LOPEZ:** And all your– and the cards, too?

**LOCKETT:** Nah, just– this my phone, my other phone the police– at the police station. That was my new phone they had got.

**LOPEZ:** Oh, okay, okay. You gotta get that then?

**LOCKETT:** [ASIDE: I'on know. Wassup, you good? You been good? Yeah, I' m m super (U/I) now. Yeah, I' m finna– I' m on the South Side. I' ll c when I (U/I). A'right, I got you. A' right.] So, um.

**LOPEZ:** Yeah.

**LOCKETT:** Already crackin' , what' s happenin' .

**LOPEZ:** You already went and picked it up?

**LOCKETT:** What? Nah, I ain't get–

[VOICES OVERLAP]

**LOPEZ:** Your phone.

**LOCKETT:** Yeah, I got my phone now. They had it in my property.

**LOPEZ:** Both of ' em?

**LOCKETT:** Yup.

**LOPEZ:** A' right. Don't make no sense.

**LOCKETT:** You said what?

**LOPEZ:** And all your– and the cards, too?

**LOCKETT:** Nah, just– this my phone, my other phone the police– at the police That was my new phone they had got.

**LOPEZ:** Oh, okay, okay. You gotta get that then?

39. Case agents recognized LOCKETT's voice using **Target Cell Phone,** based on review of prior record jail calls. Based on my training, experience, and investigation into the DTO, I believe LOCKETT retrieve his phone (**Target Cell Phone**) from police custody after being released (Yeah, I got my phone now. They had it in my property.). Further, based on review of the call, I believe LOCKETT previously possessed more than one cellphone (Lopez: "Both of ' em?"; Lockett: "Yup"). Based on my training and experience, I know that those

engaged in drug trafficking will often use multiple cellphones, to attempt to evade law enforcement. Further, based on my training and experience, I believe that LOCKETT is telling LOPEZ he is distributing controlled substances ("I'on know. Wassup, you good? You been good? Yeah, I' m good. I' m super (U/I) now. Yeah, I' m finna– I' m on the South Side. I' ll call you when I (U/I). A'right, I got you. A' right. So, um." and "Already crackin' , what' s happenin'") Based on my training, experience, and investigation into the DTO, I know that they will distribute controlled substances on the southside of Milwaukee. Further I know the term "crackin" is a slang word used by drug traffickers to refer to the distribution of controlled substances.

40. Also on January 21, 2026, case agents intercepted an outgoing call from TARGET TELEPHONE 1 to Lockett at (414) 324-5384 (Target Cell Phone) at approximately 10:53 AM. During the call, LOPEZ informs LOCKETT that "Monty" is looking for Lockett's number and to call "Monty".

**LOCKETT:** Hello.

**LOPEZ:** Hey.

**LOCKETT:** What's up babe?

**LOPEZ:** Um, what the fuck is his name? Monty is calling me talking about your number. Call him, he said he got that.

**LOCKETT:** Alright.

**LOPEZ:** Alright.

41. On 1/21/26 at approximately 11:48 AM Montrel Lenard-Ivory (m/b, 06/28/1992) was observed and video recorded entering the front of the residence of 333 N 36 St,

Milwaukee, Wisconsin.

42. On 1/21/26 at approximately 11:57 AM Montrel Lenard-Ivory (m/b, 06/28/1992) is observed leaving in a blue Honda Crosstour – WI/Reg. BBR-4644. This vehicle is registered to Donna M. Ivory (F/U, 11-24-1951). A Lexus Nexus Law Enforcement public record search also shows this to be the mother of Montrel Lenard-Ivory of the same date of birth.

43. Based on the investigating in the DTO, case agents believe "Monty" may be a source of controlled substances for LOCKETT. Based on my training, experience, and investigating into the DTO, I believe that during the call, LOPEZ is instructing LOCKETT to contact "Monty" due to Monty having controlled substances for LOCKETT ("Call him[Monty], he said he got that). I know that those engaged in drug trafficking will often not refer to the actual control substance over the phone due to concerns about others overhearing the conversation regarding illegal substances or the possibility of law enforcement detection. Instead drug trafficker may use vague identifiers like "that".

44. For the reasons detailed above, I believe that LOCKETT uses **Target Cell Phone** to engage in violations of the TARGET OFFENSES.

43. I know that persons who engage in ongoing criminal drug trafficking utilize cellular devices to further their activities. I know that traffickers utilize cellular devices to maintain contact with other affiliates and store information relating to their trafficking offenses. Case agents believed based on the ongoing investigation into the DTO that court authorized electronic surveillance of **Target Cell Phone**, will continue to assist in the investigation of the DTO. Case agents believe that the historical location data requested for the **Target Cell Phone**

will continue to assist in identifying DTO stash locations and corroborating the locations of DTO members during relevant events such as the previously completed controlled buys. I believe that the call detail records requested will continue to help identify other DTO members and potential sources of supply. I believe that the requested prospective location data will continue to assist in proactive surveillance of DTO members and will aid in the identification of DTO members/suppliers, stash locations, and meeting locations.

## IV. TECHNICAL BACKGROUND

44. Case agents believe from all the above information provided that Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, Amer S. QADAN, "VENEZUELA," "FROG," and other persons as yet unknown continue to be involved in the distribution of illegal drugs. Case agents also believe that LOCKETT, and others continue to use **Target Cell Phone** during their illegal activities, including communicating with known and unknown co-conspirators. Case agents further believe known and unknow DTO members, has made and will continue to make frequent visits to locations in which the DTO stores and distributes narcotics and/or pick up drug proceeds or location directed to do so by others including likely meeting drug sources. Case agents believe that the continued historical and prospective monitoring of **Target Cell Phone**'s location will assist in identifying potential other sources of supply, distributors, and locations associated with the DTO.

45. I believe **Target Cell Phone**, whose service providers are Dish Wireless LLC,

wireless telephone service provider, which often roam on the AT&T, T-Mobile, and other networks given its technology limitations and subcontracts it has with other service providers, (collectively "Service Providers"), contains valuable information that could be used as evidence for the distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, possession of a firearm in violation of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856; and Title 18, United States Code, Section 924(c).

46. Based on my training and experience, I know that Service Providers can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of **Target Cell Phone**, including by initiating a signal to determine the location of **Target Cell Phone** on Service Providers' network or with such other reference points as may be reasonably available.

47. In my training and experience, I have learned that the Service Providers is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.

Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

## Cell-Site Data

48. Based on my training and experience, I know that the Service Providers can collect cell-site data on a prospective basis about **Target Cell Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Providers typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## E-911 Phase II / GPS Location Data

49. I know that some providers of cellular telephone service, including Service Providers, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

50. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

51. I also know that certain wireless providers, such as Service Providers, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

52. Based on my training and experience, I know that Service Providers also can collect per-call measurement data, which Service Providers also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

53. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Providers can collect E-911 Phase

II data about the location of **Target Cell Phone**, including by initiating a signal to determine the location of **Target Cell Phone** on the Service Providers' network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

54. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

**Subscriber Information**

55. Based on my training and experience, I know that wireless providers such as the Service Providers typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or

other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Cell Phone** user or users and may assist in the identification of co-conspirators.

56. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Cell Phone's** user or users, the locations of that user or users, and the patterns of that user or users. A frequency analysis of the telephone communications between Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, Amer S. QADAN, "VENEZUELA," "FROG," and other identified and unidentified subjects is material, in that it can establish whether the calls described above are a deviation from their normal patterns of communication. The frequency analysis of the locations associated with the cellular devices can establish whether the locations are deviations or consistent with normal patterns. This information is relevant to show whether Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, Amer S. QADAN, "VENEZUELA," "FROG," and other acted-in-concert, by establishing the nature

and extent of their relationship, the existence and scope of the conspiracy, the pattern of their communications, their patterns of travel, and any deviations from those patterns.

## V. AUTHORIZATION REQUEST

57. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

58. I further request that the Court direct the Service Providers to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

59. I also request that the Court direct the Service Providers to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Providers' services, including by initiating a signal to determine the location of **Target Cell Phone** on the Service Providers' network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Providers for reasonable expenses incurred in furnishing such facilities or assistance.

60. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until April 29, 2026, pursuant to the Omnibus Order signed by Honorable Judge Stephen C. Dries on April 29, 2025. This investigation is expected to remain covert at least until then, so disclosing the warrant would alert targets or subjects about the existence of a federal investigation. This investigation targets a sophisticated drug trafficking organization with

multiple targets, subjects, and witnesses. Case agents will continue to request the same notification deadline for all warrants in this investigation, so that the notifications can be coordinated or extended as necessary. A single notification date will reduce the administrative burden on case agents and the Court, minimize the risks of disclosure, and promote judicial economy. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **Target Cell Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

61. Because the warrant will be served on the Service Providers, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **Target Cell Phone** outside of daytime hours.

<u>**ATTACHMENT A**</u>
**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. Records and information associated with the cellular device assigned call number **(414)324-5384** (the **"Target Cell Phone"**), whose service provider is Dish Wireless LLC, a wireless telephone service provider headquartered at 9601 Meridian Blvd, Englewood, CO 80112, with services also attached to AT&T, headquartered at 11760 U.S Highway 1, Suite 300, North Palm Beach, Florida, 33408; T-Mobile, headquartered 4 Sylvan Way, Parsippany, NJ 07054; or any other cell phone servicing company currently servicing these phone numbers ("Service Providers") during the requested period.

2. The **Target Cell Phone**.

**<u>ATTACHMENT B</u>**
**Particular Things to be Seized**
**MATTER NUMBER 2024R438**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Providers, including any information that has been deleted but is still available to the Service Providers or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Providers is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with **Target Cell Phone** for the time period from January 20, 2026, to present:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Target Cell Phone**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from **Target Cell Phone** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone** or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today's date, for such information associated with **Target Cell Phone**.

c. Information about the location of **Target Cell Phone** for a period of **30 days**, during all times of day and night. "Information about the location of **Target Cell Phone** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the

Service Provider's services, including by initiating a signal to determine the location of **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense; and possession of a firearm in furtherance of drug trafficking, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856; and Title 18, United States Code, Section, 924(c), have been committed by Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, Amer S. QADAN, "VENEZUELA," "FROG," and other persons as yet unknown since at least August 2024.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.